NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JORGE COLON,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Civil Action No. 12-4870 (JLL)<br><br>OPINION |

**LINARES**, District Judge.

Before the Court is Plaintiff Jorge Colon ("Plaintiff" or "Claimant")'s appeal seeking review of a final determination by Administrative Law Judge Richard West denying his application for disability insurance benefits. The Court resolves this matter on the Parties' briefs pursuant to Local Civil Rule 9.1(f). For the reasons set forth below, the Court affirms in part and vacates in part the final decision of the Commissioner of Social Security and remands for further administrative proceedings.

I. **BACKGROUND**

A. Facts and Procedural History

Plaintiff was born on February 22, 1963, and has a high school education. R. at 33.[1] He most recently worked as a mail handler for the United States Post Office, having held that position for over twenty years. *See id.* at 34. As a mail handler, Plaintiff was on his feet for eight hours a day, unloading and reloading packages from trailers. *Id.* He lifted packages that

---

[1] "R." refers to the pages of the Administrative Record.

weighed over one hundred pounds. *Id.* Plaintiff stopped working in April 2008, when he slipped and hurt his knee. *Id.* at 35. After slipping, Plaintiff had a physical that revealed a previously unknown heart condition. *Id.* at 34-35. Plaintiff subsequently underwent heart surgery at Trinitas Hospital in Elizabeth, New Jersey. *Id.* at 36.

Plaintiff's testimony suggests that his wife and children take care of most household chores. *See id.* at 53-54. Plaintiff stated that his wife shops for groceries, but that he sometimes accompanies her. *Id.* at 53. Similarly, he stated that his wife prepares meals, but that he sometimes assists her. *Id.* at 54. Plaintiff also stated that his children mow the lawn. *Id.* at 53. He stated that he is able to drive, but "[n]ot too much . . . ." *Id.* at 59.

On August 15, 2008, Plaintiff filed an application for disability insurance benefits with the Social Security Administration. *Id.* at 106-12. The Administration denied Plaintiff's application and subsequent request for reconsideration. *Id.* at 61-67. In response, Plaintiff filed a request for a hearing before an ALJ with the Office of Disability Adjudication and Review. *Id.* at 73-74. Said hearing occurred before ALJ West on July 20, 2010, in New Jersey. *Id.* at 28. After reviewing the facts of Plaintiff's case, on August 6, 2010, ALJ West issued a decision. *Id.* at 16-23. ALJ West found that Plaintiff was not disabled from April 11, 2008, the alleged onset date, through the date of decision. *Id.*

Plaintiff sought Appeals Council review. *Id.* at 10-11. The Appeals Council denied Plaintiff's request on June 8, 2012, rendering the ALJ's decision the final decision of the Commissioner. *Id.* at 6-8. As a result, Plaintiff appealed to this Court on August 3, 2012. Compl. at 1-3. This Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g).

2

B. Medical Evidence for the Relevant Time Period

Plaintiff claims that he has been disabled since April 11, 2008, because of his (1) left knee, (2) back, and (3) heart impairments. R. at 37, 106, 127. Plaintiff testified that these impairments cause him "a lot of pain." *Id.* at 37-38. Plaintiff has taken pain medications including Lyrica, Percocet, Ultram, and Voltaren. *Id.* at 356. Plaintiff also testified that he has difficulty negotiating staircases, walking more than a couple blocks on flat ground, sitting for more than half an hour, and lifting a gallon of milk. *Id.* at 45-46, 52. A discussion of each of Plaintiff's impairments follows.

1. Plaintiff's Left Knee Impairment

Plaintiff has had recurrent pain in his left knee since 1998. *Id.* at 182. On April 16, 2008, Plaintiff visited the Care Station Medical Group due to pain in his left knee. *Id.* at 198-99. Two days later, Plaintiff met with Dr. David E. Roger of the Union County Orthopaedic Group. *Id.* at 182-83. Plaintiff explained to Dr. Roger that he could no longer work because of significant pain inside his left knee that radiated to the back thereof. *Id.* at 182. He also explained that his knee would sometimes "catch," and that he had taken naproxen, which "helped a little bit but not completely." *Id.* Dr. Roger's physical examination revealed that when compared to Plaintiff's right knee, his left knee lacked five degrees of hyperextension, was boggy, and had a mild effusion. *Id.* Additionally, the examination revealed that Plaintiff ambulated with mild antalgia. *Id.* The examination further revealed that Plaintiff had pain with hyperflexion, moderate tenderness over his medial joint line, exquisite tenderness over his lateral joint line, and a positive McMurray's test. *Id.* Dr. Roger recommended that Plaintiff have an MRI and try a different anti-inflammatory medication, Relafen. *Id.* at 183.

Subsequently, in November 2008, state consultant Dr. Allen S. Glushakow met with Plaintiff. *Id.* at 333. Plaintiff noted that he had soreness in his left knee. *Id.* Dr. Glushakow's physical examination revealed that Plaintiff's left knee had full range of motion, no deformity, and no effusion. *Id.* The examination also revealed that Plaintiff could squat, walk without a limp, and had a negative McMurray's test. *Id.* at 333-34. Dr. Glushakow's impression was that Plaintiff had mild-to-moderate osteoarthritis of the left knee. *Id.* at 334. He recommended an x-ray of the left knee. *Id.*

An April 2010 report prepared by Plaintiff's treating physician, Dr. Kamran Tasharofi, noted that Plaintiff then had degenerative joint disease and arthritis of the knees. *Id.* at 413-14. Dr. Tasharofi's report also opined that Plaintiff is physically disabled because of his knee impairment and other medical conditions. *Id.* at 413

### 2. Plaintiff's Back Impairment

In January 2006, Plaintiff visited the Care Station Medical Group, in part, because of his chronic back pain. *Id.* at 207. Plaintiff noted at that time that he experienced numbness, tingling, and sharp pains from his back to his left buttock. *Id.* Subsequently, in November 2008, Dr. Glushakow conducted a physical examination of Plaintiff's cervical, thoracic, and lumbar spines. *Id.* at 333. As to Plaintiff's cervical spine, Dr. Glushakow noted that there was neither vertebral tenderness nor para-vertebral spasm. *Id.* Dr. Glushakow also noted that the movement of Plaintiff's cervical spine in flexion, extension, rotation and lateral bending was full. *Id.* As to Plaintiff's thoracic and lumbar spines, Dr. Glushakow made the same observations. *Id.* In addition, Dr. Glushakow noted that straight leg raising was negative bilaterally. *Id.*

In December 2008, Dr. Howard Kessler conducted an open MRI of Plaintiff's thoracic spine. *Id.* at 245. The MRI found that Plaintiff had small subligamentous T1-2 and T3-4 disc

herniations with mild thecal sac indentations. *Id.* The MRI also found Scmorl's nodes in the T6-7 through T11-12 disc region as well as noncompressive disc bulges in the thoracic region. *Id.* Lastly, the MRI noted that Plaintiff's thoracic spine had no central or foraminal encroachment, intra or extradural mass, or intrinsic cord abnormality. *Id.*

Dr. Kessler also conducted an open MRI of Plaintiff's lumbar spine in December 2008. *Id.* at 247-48. That MRI found that Plaintiff had a small L1-2 disc protrusion with mild thecal sac indentation, a noncompressive L2-3 disc bulge, and facet arthrosis in the L5-S1 disc. *Id.* at 248. Additionally, that MRI found L3-4 and L4-5 disc bulges with facet arthrosis and thecal sac indentations, resulting in central spinal stenosis with some right foraminal narrowing at the L4-5 level. *Id.*

In February 2009, Dr. Tasharofi examined Plaintiff. *Id.* at 401-07. At that time, Plaintiff complained of back pain that radiated to his left side. *Id.* at 401. Plaintiff described this pain as an eight or nine out of ten in intensity. *Id.* Dr. Tasharofi's examination revealed that Plaintiff had diminished trunk flexion, extension, and lateral bending. *Id.* at 403. Said examination also revealed that Plaintiff's paraspinal muscles were very tender in his lumbar and thoracic area, and that he had a loss of lumbar lordosis. *Id.* Dr. Tasharofi diagnosed Plaintiff with lumbar radiculopathy and a thoracic spine sprain. *Id.* at 404.

Plaintiff met with Dr. Nathaniel Sutain from February to April 2009. *Id.* at 421-30. When Plaintiff began seeing Dr. Sutain in February 2009, he reported lumbar radicular symptoms and a painful thoracic sensation on his left side. *Id.* at 421. Throughout this time, Dr. Sutain's examinations revealed that Plaintiff had palpable tenderness in his lumbar spine. *Id.* at 421-29. Dr. Sustain administered nerve block injections to Plaintiff. *Id.* at 427.

Dr. Tasharofi again examined Plaintiff in April 2010. *Id.* at 413-15. Dr. Tasharofi's April 2010 report revealed that Plaintiff had a loss of lordosis of the lumbar spine, tender paraspinal muscles in his thoracic and lumbar region, and a loss of range of motion in all plains. *Id.* at 414. Said report concluded that Plaintiff suffers from spinal stenosis of the lumbar region and facet arthrosis of the lumbar and thoracic regions that limits him from any lifting, reaching above his head, pushing, pulling, or climbing. *Id.*

### 3. Plaintiff's Heart Impairments

On April 24, 2008, Trinitas Hospital admitted Plaintiff after he was found to have a significant pericardial effusion with impending tamponade. *Id.* at 185. On that date, Plaintiff underwent pericardiocentesis. *Id.* The next day, Plaintiff underwent a pericardial window placement. *Id.* The following day, Plaintiff had a panic attack and developed severe chest pain and hypoxia. *Id.* Trinitas Hospital treated these conditions, and Plaintiff's pain subsided. *Id.* Trinitas discharged Plaintiff on April 29, 2009, with moderate pericardial effusion and mild pleural effusion. *Id.*

Trinitas Hospital again admitted Plaintiff on May 10, 2008, due to Plaintiff's chest pain and shortness of breath. *Id.* at 377. Plaintiff again underwent a pericardial window placement. *Id.* at 380. Dr. Tasharofi examined Plaintiff at that time, and diagnosed Plaintiff with recurrent massive pericardial effusion status post pericardial window placement. *Id.* at 370. Shortly thereafter, on May 14, 2008, Dr. Peter Lechnur examined Plaintiff. *Id.* at 380-82. Dr. Lechnur noted that Plaintiff was then improving nicely, had no significant complaints, no shortness of breath, and had only mild chest pain from the chest tube. *Id.* at 380. He concluded that Plaintiff's condition was most likely due to incidental viral pericardial effusion. *Id.* at 381.

On May 18, 2008, Dr. Sahil Dhru examined Plaintiff. *Id.* at 372-73. Dr. Dhru noted that Plaintiff's heart rate was stable and that he had no chest pain or palpitations. *Id.* at 372. He also noted that an electrocardiogram done two days prior revealed minimal pericardial fluid and no evidence of tamponade. *Id.* Not long thereafter on May 29, 2008, Plaintiff met with Dr. Hyeun Park. *Id.* at 270. Dr. Park noted that a chest x-ray reveled cardiomegaly and that Plaintiff was experiencing chest discomfort and shortness of breath. *Id.* However, Dr. Park noted that Plaintiff felt "well." *Id.* An electrocardiogram administered by Dr. Park showed no evidence of significant pericardial effusion. *Id.* at 271.

In August 2008, Dr. Tasharofi prepared an internal medicine report concerning Plaintiff. *Id.* at 208-12. Dr. Tasharofi's report noted that an August, 14 2008 x-ray showed that Plaintiff had a displaced fracture of his fifth and sixth ribs. *Id.* at 209. This x-ray also showed that Plaintiff had a normal-sized heart. *Id.* at 322. Dr. Tasharofi's report further noted that Plaintiff was then experiencing shortness of breath and daily chest pain in his left anterior chest wall that lasted for hours and radiated from his left side to his left arm. *Id.* at 210. The report noted that Dr. Tasharofi treated these symptoms with non-steroidal anti-inflammatory drugs, and gave Plaintiff a "fair" prognosis. *Id.*

In January 2009, Trinitas Hospital admitted Plaintiff with shortness of breath. *Id.* at 349. Trinitas Hospital administered a cardiac catheterization. *Id.* Medical management was recommended. *Id.* at 351.

Dr. Tasharofi's April 2010 report opined that Plaintiff is physically disabled because of his heart and other medical conditions. *Id.* at 413. That report noted that Plaintiff appeared stable from a cardiac standpoint, but that he will permanently suffer from nerve damage in his chest and should refrain from heavy lifting greater than ten pounds. *Id.* at 414. During

7

Plaintiff's hearing before ALJ West in July 2010, Plaintiff noted that he experiences "a lot" of shortness of breath and "really bad" chest pain. *Id.* at 37-38. Plaintiff also noted that anytime he lifts something the side of chest hurts. *Id.* at 41.

## II. LEGAL STANDARD

### A. The Five-Step Process for Evaluating Whether a Claimant Has a Disability

Under the Social Security Act, the Administration is authorized to pay disability insurance benefits to "disabled" persons. 42 U.S.C. § 423(a). A person is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A person is unable to engage in substantial gainful activity when his physical or mental impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Regulations promulgated under the Social Security Act establish a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(1). At step one, the ALJ assesses whether the claimant is currently performing substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and, thus, the process ends. *Id.* If not, the ALJ proceeds to step two and determines whether the claimant has a "severe" physical or mental impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). Absent such impairment, the claimant is not disabled. *Id.* Conversely, if the claimant has such impairment, the ALJ proceeds to step three. *Id.* At step three, the ALJ evaluates whether the claimant's severe impairment either meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). If

so, the claimant is disabled. *Id.* Otherwise, the ALJ moves on to step four, which involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity [("RFC")]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). The claimant is not disabled if his RFC allows him to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). However, if the claimant's RFC prevents him from doing so, the ALJ proceeds to the fifth and final step of the process. *Id.*

The claimant bears the burden of proof for steps one, two, and four. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000). Neither side bears the burden of proof for step three "[b]ecause step three involves a conclusive presumption based on the listings . . . ." *Id.* at 263 n. 2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n. 5, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987)). The ALJ bears the burden of proof for the final step. *See id.* at 263. The final step requires the ALJ to "show [that] there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). In doing so, "[t]he ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled." *Id.* (citation omitted).

B.  The Standard of Review: "Substantial Evidence"[2]

This Court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means

---

[2] Because the regulations governing SSI—20 C.F.R. § 416.920—are identical to those covering disability insurance benefits—20 C.F.R. § 404.1520—this Court will consider case law developed under both regimes. *Rutherford v. Barnhart*, 399 F.3d 546, 551 n. 1 (3d Cir. 2005) (citation omitted).

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938)). To determine whether an ALJ's decision is supported by substantial evidence, this Court must review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, this Court may not "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted). Consequently, this Court may not set an ALJ's decision aside, "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citations omitted).

### III. DISCUSSION

At step one, the ALJ found that Plaintiff "ha[d] not engaged in substantial gainful activity since April 11, 2008, the alleged onset date . . . ." R. at 18. At step two, the ALJ found that Plaintiff had the following severe impairments: cardiomegaly, chronic pain syndrome, coronary artery disease, obesity, osteoarthritis, sleep apnea, spinal stenosis, status post pericardial effusion, and status post rib fractures. *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *Id.* at 21. At step four, the ALJ found that Plaintiff had the RFC to "lift and/or carry 10 pounds occasionally. In an 8-hour day he can stand and/or walk 2 hours; sit 6 hours, pushing/pulling unlimited. The claimant cannot climb ladders, ramps or stairs. He is limited to occasional kneeling and crawling." *Id.* The ALJ then concluded that this "sedentary RFC" prevented Plaintiff from performing his past work as a mail carrier. *Id.* at 22. At step five, the ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. *Id.* at 23. Thus, the ALJ concluded that Plaintiff was not disabled. *Id.*

at 23. Plaintiff contends that ALJ West's Decision should be reversed because (1) the step three analysis is flawed and (2) it did not properly assess Plaintiff's credibility.

A. Whether ALJ West's Analysis at Step Three is Flawed

Plaintiff contends that ALJ West's analysis at step three is flawed because it "makes conclusory statements that plaintiff's impairments do not meet or equal the Listings but fails to discuss the reasons and rationales with references to the supporting evidence . . . ." Pl. Br. 14, ECF No. 22. An ALJ must "fully develop the record and explain his findings at step three, including an analysis of whether and why [each of the claimant's] impairments, or those impairments combined, are or are not equivalent in severity to one of the listed impairments." *Burnett*, 220 F.3d at 120. In conducting such an analysis, there is no formal requirement that the ALJ "use particular language or adhere to a particular format . . . ." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). Rather, the ALJ's decision, "read as a whole," must permit meaningful judicial review of its step three determination by developing the record and explaining its findings. *Id.*; *Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146 (3d Cir. 2007) (citations omitted).

Here, ALJ West's Decision found that Plaintiff did "not have an impairment or combination of impairments that [met] or medically equal[ed] one of the listed impairments . . . ." R. at 21. The Decision noted that it paid "particular attention" to the impairments listed in Sections 1.00 (musculoskeletal system) and 4.00 (cardiovascular system). *Id.* The Decision specifically found that Plaintiff's back and heart impairments did not satisfy the requirements of Sections 1.04 (disorders of the spine) and 4.02 (chronic heart failure), respectively. *Id.* Reading the Decision "as a whole," it later explains that MRIs of Plaintiff's back "show only slight abnormalities of the spine." *Id.* at 22. The Decision also later explains that Plaintiff's cardiac

symptoms were then "stable" and provides a supporting citation to Dr. Tasharofi's April 26, 2010 report. *Id.* These explanations enable this Court to conduct a meaningful judicial review of ALJ West's step three findings, and amount to more than a mere scintilla. *See Jones*, 364 F.3d at 505 (noting that "ALJ's decision, read as a whole, illustrat[ed] that the ALJ considered the appropriate factors in [concluding] that [plaintiff] did not meet the requirements for any listing . . . ."). Moreover, Plaintiff has neither "suggest[ed] which listing the ALJ should have applied" nor "point[ed] to any medical evidence ignored by the ALJ that would show that [his] impairments medically equaled one of the listings." *See Cosby*, 231 F. App'x at 146 (finding these shortcomings significant). Accordingly, the Court finds that ALJ West's step three findings are based on substantial evidence.

### B. Whether ALJ West Properly Assessed Plaintiff's Credibility

Plaintiff presents mixed arguments suggesting that ALJ West's Decision is not supported by substantial evidence.[3] Most notably, Plaintiff contends that ALJ West's assessment of his credibility is deficient because it fails to give proper credence to his complaints about his chronic pain and other symptoms. *See* Pl. Br. 13-15. Specifically, Plaintiff argues that ALJ West's "failure . . . to apply the correct legal standard concerning pain is an error and requires reversal" and that ALJ West was "obligated to make specific findings" when assessing his credibility. *Id.* at 14. The Court quotes ALJ West's assessment of Plaintiff's credibility:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment.

R. at 22.

---

[3] Contrary to Plaintiff's assertions, ALJ West's decision does not fail to mention Plaintiff's panic attacks and depression or Dr. Nathaniel Sutain's medical reports. R. at 18. Accordingly, the Court does not discuss these assertions any further.

12

This exact language has been derided by one circuit "as 'meaningless boilerplate' because it fails to link the conclusory statements made with objective evidence in the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2012) (citations omitted). As stated in Social Security Rule 96-7p, "[t]he reasons for [a] credibility finding must be grounded in the evidence and articulated in the . . . decision. It is not sufficient to make a conclusory statement that . . . 'the allegations are (or are not credible).'" An ALJ's use of such boilerplate, however, does not doom his decision if he otherwise explains his credibility determination. *Pepper*, 712 F.3d at 368. When making a credibility determination that rejects a plaintiff's complaints of disabling pain as incredible, an ALJ "must consider the subjective pain *and specify his reasons* for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990) (citation omitted) (emphasis added).

It is clear to this Court that ALJ West considered Plaintiff's complaints of pain. ALJ West's recital of the Record at step two is rife with references to Plaintiff's complaints of pain. R. at 18-21. Likewise, at step four, ALJ West noted that Plaintiff "experienced residual chest pain due to ribs and/or heart procedure." *Id.* at 22. ALJ West then concluded that Plaintiff's "[s]hortness of breath and pain limits [him] to a sedentary RFC." *Id.* Defendant is correct in noting that this conclusion "largely credits Plaintiff's statements about his abilities." Def. Opp'n Br. 4. That said, the Court notes that ALJ West's conclusion necessarily implies that he rejected Plaintiff's claim that his pain and other symptoms are totally disabling.

It is unclear to this Court why ALJ West rejected Plaintiff's claim that his pain and other symptoms are disabling since he did not "specify his reasons" as required by

13

this Circuit in *Matullo*. In failing to specify his reasons, ALJ West also failed to comply with his obligation "to provide an adequate basis so that the reviewing court can determine whether the administrative decision is based on substantial evidence." *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981). ALJ West's assessment that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above [sedentary RFC] assessment" is just not specific enough to allow for judicial review without further explanation. *See Pepper*, 712 F.3d at 367 (citations omitted) (noting that this language "does not explain, or direct a reviewing court to, what the ALJ relied on when making his determination."). As a result, this Court remands this matter for further proceedings. On remand, ALJ West should explain how he arrived at his determination regarding Plaintiff's credibility.

Lastly, Plaintiff raises the related contention that ALJ West did not adequately explain his reason for discounting parts of treating physician Dr. Tasharofi's opinion. Pl. Br. 14-15. ALJ West gave lesser weight to Dr. Tasharofi's opinion, in part, because it appeared to be a recitation of Plaintiff's symptoms. R. at 22. On remand, ALJ West should explain why the incredibility of Plaintiff's symptoms, including his subjective pain, justifies granting lesser weight to Dr. Tasharofi's opinion. For the reasons set forth in the previous paragraph, this justification is unclear to this Court at this time and, thus, hinders any meaningful judicial review.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that substantial evidence supports ALJ West's determination at step three. However, ALJ West's assessment of Plaintiff's credibility does not

14

allow judicial review. Therefore, the Court vacates ALJ West's Decision and remands this matter to allow him to develop his reasoning and analysis. In doing so, the Court declines Plaintiff's request that this Court reverse ALJ West's Decision and grant Plaintiff benefits. An appropriate Order accompanies this Opinion.

DATED: November 19, 2013

JOSE L. LINARES
U.S. DISTRICT JUDGE